ev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

**ORIGINAL**

# UNITED STATES DISTRICT COURT

for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. **16-1342M** |
| Digital Devices in the Custody of the FBI, Seized on May 7, 2016 | ) |
| | ) |
| | ) |

**FILED** 2016 NOV 17 AM 10: 3

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

>     See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

>     See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.   Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before ___14 days from the date of its issuance___
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge __on duty at the time of the return through a filing with the Clerk__'s Office.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  6/30/2016  2:38 pm          *Alicia G. Rosenberg*
                                                    *Judge's signature*

City and state:   Los Angeles, California          U.S. Magistrate Judge
                                                    *Printed name and title*

AUSA: Devon Myers (x0649)

.v. 12/09) Search and Seizure Warrant (Page 2)

## Return

| Case No.: 16-1342m   LA-7759819 | Date and time warrant executed:   7/1/2016   0800 | Copy of warrant and inventory left with:   N/A* |
|---|---|---|

Inventory made in the presence of :   SA RANDALL DEVINE

Inventory of the property taken and name of any person(s) seized:

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

ONE(1) CANON EOS 5D MARK III CAMERA WITH TWO(2) SD FLASH CARDS

ONE (1) WHITE iPHONE MODEL A 1532

ONE (1) BLACK DELL LAPTOP MODEL LATITUDE E5500

* PROPERTY TRANSFERRED TO FBI. FROM DEPT. OF DEFENSE

## Certification (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date: 11/17/16

*Executing officer's signature*

RANDALL DEVINE, SPECIAL AGENT
*Printed name and title*

AUSA: Devon Myers (x0649)

## ATTACHMENT A

DEVICES TO BE SEARCHED

The following digital devices seized by the U.S. Army Garrison Investigators in Kwajalein on or about May 7, 2016, and are currently in the possession of the Federal Bureau of Investigation in Los Angeles, California:

a.   One CANON EOS 5D Mark III camera with serial number 0820240 13286, black in color, made of plastic with attached lens (CANON Zoom Lens EF 24-70 mm 1 :2.8) ("SUBJECT DEVICE ONE");

b.   One white iPhone, model A 1532, with IMEI 358821053678253 with a case printed with a Marshall Islands' flag ("SUBJECT DEVICE TWO");

c.   One black Dell laptop made of plastic, model Latitude E5500, service tag number 7K99KHI(no observable serial number), and with "Alberts View" sticker adhered to the lid ("SUBJECT DEVICE THREE") *collectively, with the preceding devices, the "SUBJECT DEVICES")*

d.   One black computer tower with the name "Cooler Master" on the front and top with a UPC label #RC922MKKN 1111 0900971. A sticker, approximately 3"x I 1/2", green and purple in color is located on the right hand side and marked for identification as BMF1153717 ("SUBJECT DEVICE FOUR");

e.   One flash drive, SanDisk brand, black and silver in color, with "USB 3.0, 32 GB" written on top, and "SanDisk" written in red on front AND marked for identification as BMF1154017 ("SUBJECT DEVICE FIVE");

i   Instrumentality Protocol

f.    One white DVD titled "Digital Photography DVD," with illegible handwriting next to "Bad Reads" and "Territory/Studio/Job No," and marked for identification as BMF1154617 ("SUBJECT DEVICE SIX");

g.    One white DVD, titled "Liletouch Special Events" and and marked for identification as BMF1154617 ("SUBJECT DEVICE SEVEN");

h.    One white DVD titled "Lifetouch Special Events" and marked for identification as BMF 154617 ("SUBJECT DEVICE EIGHT");

i.    One silver CD-R with silver writing, Verbatim brand, 700 MB and marked for identification as BMF/ 154617 ("SUBJECT DEVICE NINE");

j.    One black Samsung CD with white writing titled "Samsung Solid State Drive" on the right side ("SUBJECT DEVICE TEN");

k.    One white DVD titled "Digital Photography DVD," with handwriting next to "Territory/Studio/Job No." that reads "Windows 7" and marked for identification as BMF/154617 ("SUBJECT DEVICE ELEVEN");

l.    One silver Memorex CD-R with 700 MB storage and the words "Recovery CD" written on the top and "Win 7" is written on the bottom. Disc was stored in a paper sleeve with clear plastic front. Scribbling is visible on the top of the paper sleeve in black ink. The seals were marked for identification as BMFI154617 ("SUBJECT DEVICE TWELVE");

ii   Instrumentality Protocol

AG

m.    One black and red SanDisk flash drive, Extreme 11 model, with storage of 4 GB, with white, gold, and red print. Flash drive is stored in a clear plastic case. The seals were marked for identification as BMFI1 54217 MAY 16 ("SUBJECT DEVICE THIRTEEN");

n.    One green Kingston Technology flash drive with I GB of storage with a picture of white flower on front and marked for identification as BMF\ I 54217 MAY 16 ("SUBJECT DEVICE FOURTEEN");

o.    One black and gold Lexar flash drive, Professional 233x model, with 16 GB of storage, with black and white print.  Flash drive is stored in a clear plastic case and marked for identification as BMFI154217 MAY 16 ("SUBJECT DEVICE FIFTEEN");

p.    One black and gold Lexar flash drive, Professional400x model, with 16 GB of storage, with black and white print.  Flash drive is stored in a clear plastic case and marked for identification as BMF/154217 MAY 16 ("SUBJECT DEVICE SIXTEEN");

q.    Fourteen gold and silver Maxell DVD-R's with 4.7 GB of storage, stored in original black plastic spindle with clear plastic cover and marked for identification as BMFI154617 MAY 16 ("SUBJECT DEVICES SEVENTEEN through THIRTY");

r.    Four silver Verbatim DVD-R's with 4.7 GB of storage, unmarked with top and bottom plastic cover from original packaging. The Discs are very scratched on both sides and marked for identification as BMFI154617 MAY 16 ("SUBJECT

DEVICES THIRTY ONE through THIRTY FOUR") (collectively, with the preceding devices, the "SUBJECT DEVICES").

## ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized are the evidence, fruits, and instrumentalities of violations of ~~18 U.S.C. § 2251(a), (e)~~ ~~(production of child pornography), 18 U.S.C. § 2252(a)(5)(B),~~  ~~(b)(2) (possession of child pornography), 18 U.S.C. § 2422(a),~~ ~~(b) (persuading or coercing someone to travel to engage in~~ ~~prostitution),~~ 18 U.S.C. § 2423(b)(travel with intent to engage in illicit sexual conduct) and 18 U.S.C. § 2423(c) (engaging in illicit sexual conduct in foreign places), (collectively, the "SUBJECT OFFENSES"), from the SUBJECT DEVICES, as defined in Attachment A, namely:

~~a.    Child pornography, including sexually explicit~~ ~~images of children, as defined in 18 U.S.C. § 2256(8);~~

~~b.    Any records, documents, programs, applications,~~ ~~or materials, including electronic mail and electronic messages,~~ ~~that refer to child pornography, including but not limited to~~ ~~documents that refer to the possession, receipt, distribution,~~ ~~transmission, reproduction, viewing, sharing, purchase,~~ ~~downloading, production, shipment, order, requesting, trade, or~~ ~~transaction of any kind, involving child pornography;~~

~~c.    Any records, documents, programs, applications,~~ ~~or materials, including electronic mail and electronic messages,~~ ~~tending to identify persons involved in the possession, receipt,~~ ~~distribution, transmission, reproduction, viewing, sharing,~~ ~~purchase, downloading, production, shipment, order, requesting,~~ ~~trade, or transaction of any kind, involving child pornography;~~

a.
~~d.~~    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,

AGR

that identify ~~any minor~~ M.C. visually depicted ~~while engaging in~~ with or without clothes; ~~sexually explicit conduct, as defined in 18 U.S.C. § 2256;~~

~~e.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing~~

AGR

~~to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.   Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings;~~

b.
~~f.~~    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
that pertains to accounts with any Internet Service Provider;

c.
~~g.~~    Any and all communications with individuals who

AGR

can be identified as ~~minors;~~ M.C. or N.G.;

d.
~~h.~~    Any and all evidence of travel plans, making
travel plans, and financing travel plans;

e.
~~i.~~    Any records, documents, programs, applications,
or materials, including electronic mail and electronic messages,
regarding ownership and/or possession and/or use of any digital
device(s) found inside the SUBJECT DEVICES;

~~j.   Any SUBJECT DEVICE used to facilitate the above~~

*AGL* ~~listed violations (and forensic copies thereof);~~

2.   With respect to any SUBJECT DEVICE used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        h.    records of or information about Internet Protocol
addresses used by the device.

        ~~i.    records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.~~

## II.   SEARCH PROCEDURES FOR DIGITAL DEVICES

        3.    In searching the SUBJECT DEVICES (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

        a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any SUBJECT DEVICE capable of being used to facilitate
the above-listed violations or containing data falling within
the scope of the items to be seized.

        b.    The search team will, in its discretion, either
search each SUBJECT DEVICE where it is currently located or
transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

        c.    The search team shall complete the search of the
SUBJECT DEVICE(S) as soon as is practicable but not to exceed
120 days from the date of issuance of the warrant.  If
additional time is needed, the government may seek an extension

of this time period from the Court on or before the date by which the search was to have been completed.

     d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

     i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

     ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

     iii. The search team may use sophisticated hashing tools, such as tools for identifying child pornography, including "EnCase" and "FTK" (Forensic Tool Kit).

     e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence

of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

    f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

    g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the SUBJECT DEVICE but may not access them (after the time for searching the device has expired) absent further court order.

    i.    The government may retain a SUBJECT DEVICE itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the SUBJECT DEVICE is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the SUBJECT DEVICE (or while an application for such an order is pending).  Otherwise, the government must return the SUBJECT DEVICE.

j.    Notwithstanding the above, after the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Randall Devine, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed for over seventeen years. I currently investigate the sexual exploitation of children, including the production, distribution, and possession of child pornography, in the Central District of California, as part of the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team. The SAFE Team is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 2251, et seq. During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, including, but not limited to, child pornography investigations and the sexual exploitation of children. During the investigation of these cases, I have executed and participated in the execution of search and arrest warrants and seized evidence of violations of United States laws. I have also attended training classes and seminars concerning computer crimes and the sexual exploitation of children.

2.   While employed by the FBI as a SA in the Los Angeles Division, I have worked closely with colleagues and several task force officers ("TFOs") who investigate federal criminal violations related to high technology or cyber crime, child

Instrumentality Protocol

exploitation, and child pornography.  I have had the opportunity
to observe numerous examples of child pornography (as defined in
18 U.S.C. § 2256) in many forms of media, including computer
media.

## II. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a search warrant
for the SUBJECT DEVICES described in Attachment A, for the items
to be seized described in Attachment B.

2.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## III. DEVICES TO BE SEARCHED

3.    The devices to be searched are the thirty four SUBJECT
DEVICES described in Attachment A, which is incorporated herein
by reference.

## IV. ITEMS TO BE SEIZED

4.    The items to be seized are the evidence, fruits, and
instrumentalities of violations of 18 U.S.C. § 2251(a), (e)
(production of child pornography); 18 U.S.C. § 2252(a)(5)(B),
(b)(2) (possession of child pornography); 18 U.S.C. § 2422(a),
(b) (persuading or coercing someone to travel to engage in

prostitution); 18 U.S.C. § 2423(b)(travel with intent to engage in illicit sexual conduct) and 18 U.S.C. § 2423(c) (engaging in illicit sexual conduct in foreign places), (collectively, the "SUBJECT OFFENSES"), as described in Attachment B, which is incorporated herein by reference.

## V.  SUMMARY OF PROBABLE CAUSE

5.   Based on my review of reports from and interviews with Investigators from the Marshall Islands Police Department ("MIPD"), and my communications with Investigator Thomas A. Bedwell ("Investigator Bedwell") from the U.S. Army Garrison and SA Gary Nations ("SA Nations") from the U.S. Army Criminal Investigative Division, I learned that ALBERT ISAJANYAN ("ISAJANYAN"), who was working at the U.S. Army Garrison on Kwajalein Atoll ("USAG-KA"), was identified as a person who travelled to a nearby island to have a sexual relationship with a fifteen year old girl. Isajanyan was more then four (4) years older than the victim.

6.   As a United States military base, USAG-KA is within the territorial jurisdiction of the United States of America such that I am empowered to conduct lawfully-authorized searches and seizures of the devices that were seized there and are now in my possession for a target who also has a residence in the Central District of California.

7.   Both the fifteen year old victim and another under-age witness provided statements that ISAJANYAN had nude pictures of the victim on SUBJECT DEVICES ONE and TWO and had a sexual relationship with the victim.  After completing their investigation, MIPD officers as well as officers from USAG-KA

searched ISAJANYAN and his apartment and recovered the SUBJECT
DEVICES.

## VI. DEFINITIONS

8.    The following terms, as used in this affidavit, have
the following meanings:

a.    "Minor," "sexually explicit conduct," "visual
depiction," "producing," and "child pornography" are defined as
set forth in 18 U.S.C. § 2256;

b.    "Child Erotica" means materials or items that are
sexually arousing to persons who have a sexual interest in
minors, but that are not, in and of themselves, legally obscene,
or do not necessarily depict minors in sexually explicit
conduct;

c.    "Computer" is defined pursuant to 18 U.S.C. §
1030(e)(1) as "an electronic, magnetic, optical,
electrochemical, or other high speed data processing device
performing logical or storage functions, and includes any data
storage facility or communications facility directly related to
or operating in conjunction with such device;

d.    "Computer software" or "software" is digital
information that can be interpreted by a computer or any of its
related components to direct the way they work.  Computer
software is stored in electronic, magnetic, or other digital
form.  It commonly includes programs to run operating systems,
applications, and utilities;

e.    "File Transfer Protocol" ("FTP") is a standard
network protocol used to transfer computer files from one host

to another over a computer network, such as the Internet.  FTP
is built on client-server architecture and uses separate control
and data connections between the client and the server.

       f.   "Internet" is defined as the worldwide network of
computers -- a noncommercial, self-governing network devoted
mostly to communication and research with roughly 500 million
users worldwide.  The Internet is not an online service and has
no real central hub.  It is a collection of tens of thousands of
computer networks, online services, and single user components.
In order to access the Internet, an individual computer user
must use an access provider, such as a university, employer, or
commercial Internet Service Provider, which operates a host
computer with direct access to the Internet.

       g.   "Internet Service Providers" ("ISPs") are
commercial organizations that are in business to provide
individuals and businesses access to the Internet.  ISPs provide
a range of functions for their customers, including access to
the Internet, web hosting, e-mail, remote storage, and co-
location of computers and other communications equipment.  ISPs
can offer a range of options in providing access to the
Internet, including telephone based dial-up, broadband based
access via digital subscriber line ("DSL") or cable television,
dedicated circuits, or satellite based subscription.  ISPs
typically charge a fee based upon the type of connection and
volume of data, called bandwidth, which the connection supports.
Many ISPs store information such as a subscriber's account name
(a user name or screen name), an e-mail address, an e-mail

mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with the ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

      h.    "Military Extraterritorial Jurisdictional Act" or "MEJA" is codified at 18 U.S.C. § 3621 and provides that: "Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States while employed by or accompanying the Armed Forces outside the United States shall be punished as provided for that offense."  MEJA defines "employed by the Armed Forces outside the United States" to include civilian employees of the Department of Defense or any other federal agency to the extent that the employment relates to supporting the mission of the Department of Defense overseas who is present or residing outside the United States in connection with that employment and is not a national of the host nation.

## VII. STATEMENT OF PROBABLE CAUSE

    9.    Based on my review of the reports written by MIPD Investigator Yoshi J. Kemem  ("Investigator Kemem"), MIPD Investigator Alexander Capelle ("Investigator Capelle"), Sergeant Robert Stack ("Sergeant Stack") from the United States Army Provost Marshal Office, and Gregory Bush from the Office of the Provost Marshal, and debriefings with other law enforcement

officers, including Investigator Bedwell and SA Nations, I am
aware of the following:

   a.   According to a report from Investigator Kemem, on
the evening of May 4, 2016, Investigator Kemem, from the
Marshall Atoll of Kwajalein,[1] received a complaint from Melu
Loeak ("Leoak"), a resident of the nearby Marshall Atoll of
Ebeye.  Loeak wanted to alert the MIPD on Kwajalein that an
American male from Kwajalein visited Ebeye to contact under-aged
females.  Loeak identified two under-aged females and explained
that the American was a supervisor who was using his local
employee, someone named Barson Calep ("Calep"), to introduce him
to the under-aged girls.  Loeak further reported that the
American spent the night with the under-aged girls at the Ebeye
Hotel as well as other places.  Investigator Kemem instructed
Loeak to have the mothers of the under-aged girls file a police
report with the MIPD in Ebeye.

   b.   According to the report from Investigator Kemem,
he believed that the American Loeak described was ISAJANYAN
because the reported contact offender was a supervisor for whom
Calep worked, and Kemem's familiarity with the Americans who
live on Kwajalein and work on the military base.  Kemem knew
that ISAJANYAN was a supervisor and that Calep worked for him.

   c.   In a subsequent interview, Investigator Kemem
told me that he printed pictures of ISAJANYAN from the

_____

   [1] Based on my own research and discussions with local
investigators, I know that the Kwajalein Atoll is the location
of a large U.S. space tracking and missile defense facility
operated by the Department of Defense.

Electronic Badging System, a records database used on the
Kwajalien Atoll to identify everyone who was affiliated with the
military base, so that he could ask witnesses about his identity
in connection with the investigation.[2]

     d.    According to the reports from Investigator Kemem
and Investigator Capelle, the next day, on May 5, 2016,
Investigator Kemem visited MIPD's office in Ebeye and met with
Investigator Capelle and others regarding the allegations and
his belief that the suspect was ISAJANYAN.  Investigator Kemem
relayed Loeak's tip that the mother of one of the under-aged
women, Amiko Lome ("Lome"), found her daughter, N.G., mingling
with Calep, the American (now suspected to be ISAJANYAN), and
another under-aged woman, M.C.

     e.    According to the report from Investigator
Capelle, he interviewed Lome on May 5, 2016.  Lome told
Investigator Capelle that after her daughter N.G. failed to
appear for her curfew, Lome looked for her and found her the
next day, on May 1, 2016, at Calep's residence.  Lome reported
that the American and M.C. were also there.  Lome told
investigators that her daughter was sixteen years old.

     f.    According to the report from Investigator
Capelle, he then interviewed N.G. in Lome's presence.  N.G. told
Investigator Capelle that an adult male named "Albert" provided

---

[2] I know from the reports of investigation and my
communications with Investigator Kemem that ISAJANYAN is a
United States citizen and a civilian employee at the military
base on Kwajalein Atoll and that he is not a national or
ordinarily a resident of the Marshall Islands.

alcohol to M.C., who was N.G.'s friend, and that M.C. told N.G. that she (M.C.) had engaged in sex with Albert.  N.G. also reported that "Albert" had nude photographs of M.C. on his cellphone.  N.G. said that prior to Lome's arrival at Calep's house, "Albert" was leaving to catch the ferry to Kwajalein and told the group that he would be returning and that they should all meet up again.

      g.  In a subsequent interview, Investigator Kemem told me that both Lome and N.G. confirmed that the photograph of ISAJANYAN from the electronic badging system was the person they knew as "Albert."

      h.  According to the reports from Investigator Kemem and Investigator Capelle, they then interviewed M.C. in the presence of her grandmother.  M.C. was fifteen.[3]  M.C. told the investigators that she met "Albert" the year before and they began a relationship.  M.C. reported that she had engaged in sex with "Albert" about six times, including at the Ebeye Hotel.  M.C. stated that N.G. took two photos of M.C. nude, one inside a bathroom and the other on a bed, and that those photographs were stored on "Albert's" cellular telephone (SUBJECT DEVICE TWO).  M.C. said that "Albert" had photographs of her with and without clothes on both his cellular telephone (SUBJECT DEVICE TWO) and his camera (SUBJECT DEVICE ONE).

      i.  In a subsequent interview, Investigator Kemem told me that he showed M.C. the photograph of ISAJANYAN from the

---

[3] I have confirmed that M.C. was born in August 2000 through a copy of her birth certificate.

Electronic Badging System and she confirmed that it was the
person she knew as "Albert."

      j.    Based on all of this information, the
investigators concluded that the American identified as "Albert"
was ISAJANYAN.

      k.    In a subsequent interview on or about May 6,
2016, Investigator Kemem and Investigator Capelle interviewed
Calep at the police station on Ebeye.  When the investigators
asked Calep why he thought they wanted to interview him, Calep
immediately stated that he thought it was to discuss the girls
that he would find for his boss, "Albert."  Calep said that he
thought the girls that he brought to "Albert" were 18 years'
old.  Investigator Kemem then confirmed with Calep's employer
that Calep's supervisor was ISAJANYAN.

      l.    On May 6, 2016, Inspector Kemem applied for
authority within the military command to apprehend ISAJANYAN, to
search his work areas, and to seize his cellular telephone
(SUBJECT DEVICE TWO) and camera (SUBJECT DEVICE ONE), both of
which Investigator Kemem believed to have nude photographs of
M.C.  Because ISAJANYAN worked on the USAG-KA, Inspector Kemem
submitted the request up through the proper military channels to
Colonel Michael M. Larsen ("Colonel Larsen"), the U.S. Army
Commander for the base.  Colonel Larsen approved it.  A true and
correct copy is attached hereto as **Exhibit A** and is incorporated
by reference herein.

      m.    According to a report from Sergeant Robert Stack
("Sergeant Stack") from the Department of Army Civilian Police,

he, along with two other sergeants, arrested ISAJANYAN when he
returned on the ferry from Ebeye on May 6, 2016.  Sergeant Stack
also confiscated SUBJECT DEVICE TWO, which is a cellular
telephone, as set forth in Attachment A, at that time from
ISAJANYAN's person.  ISAJANYAN refused to unlock SUBJECT DEVICE
TWO.

        n.    Sergeant Stack, as documented in his report, then
sought military permission to search ISAJANYAN's assigned
quarters, known as Sands BQ room 108, to find ISAJANYAN's camera
(SUBJECT DEVICE ONE) because it was not on ISAJANYAN at the time
of his arrest.  Colonel Larsen approved that request on May 7,
2016.  A true and correct copy is attached hereto as **Exhibit B**
and is incorporated by reference herein.  During the search of
ISAJANYAN's room, Sergeant Stack recovered SUBJECT DEVICE ONE,
which is a digital camera that matched the description provided
by the witnesses and is further described in Attachment A below.
During the search the law enforcement officers also saw other
digital devices and places where digital devices could be
stored.  They also found marijuana.

        o.    Also on May 7, 2016, as documented in the report
from Sergeant Stack, Sergeant Ryan Brocksmith sought military
permission to conduct another search of Sands BQ room 108 to
seize the digital media that law enforcement officers saw during
their initial search.  Colonel Larsen approved the request.  A
true and correct copy is attached hereto as **Exhibit C** and is
incorporated by reference. Officers then seized SUBJECT DEVICES
THREE through THIRTY FOUR from ISAJANYAN's residence.

p.    On May 7, 2016, as documented in a letter from Colonel Larsen to ISAJANYAN, Colonel Larsen issued an immediate, permanent bar of ISAJANYAN from USAG-KA due to his possession of marijuana.

q.    That same day, Sergeant Stack, as documented in the rights warning certificate, interviewed ISAJANYAN and advised him of his rights.   ISAJANYAN indicated he wanted a lawyer and did not speak with Sergeant Stack.

10.   On June 2, 2016, Supervisory Police Officer James Edwards, a U.S. Army Civilian Police Officer, notified me that ISAJANYAN provided his contact information for where he would be living after leaving Kwajalein, which is an address in Granada Hills, California.   I conducted a database search for ISAJANYAN and found that, as of May 26, 2016, the address associated with him matched the address ISAJANYAN provided to Officer Edwards.

VIII.    TRAINING AND EXPERIENCE ON CHILD PORNOGRAPHY AND INDIVIDUALS WITH SEXUAL INTEREST IN CHILDREN

A.   Training on Child Pornography and Computers

11.   Based on my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I know the following:

a.    Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other.   Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

      b.    Individuals with an interest in child pornography can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras, when a photograph is taken, it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer.  In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera can be stored on a removable memory card in the camera.  These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs.  Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive on the camera.  The video files can then be easily transferred from the camcorder to a computer.

      c.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the methods of distributing and receiving child pornography.  Child pornography can be transferred via electronic mail or through FTPs to anyone with access to a computer and modem.  Because of the proliferation of

commercial services that provide electronic mail service, chat services (e.g., Instant Messaging), and easy access to the Internet, the computer is a preferred method for distributing and receiving child pornography.

      d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person.

      e.    The Internet affords individuals many different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

      f.    Individuals can also use online resources to retrieve and store child pornography, including services offered

by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

g.   As is the case with most digital technology, communications via a computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, such as by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, because traces of the path of an electronic communication may be automatically stored in many places, including in temporary files or ISP client software, among other locations.  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

**B.    Training and Experience On Individuals With Sexual Interest In Children**

12.   As set forth above, there is probable cause to believe that SUBJECT DEVICES ONE and TWO contain sexually explicit images of children based on the witnesses' reports.  Because I

know from my training and experience that people who collect
sexually explicit images of children store it on multiple
devices, I believe the existence of sexually explicit images on
SUBJECT DEVICES ONE and TWO gives rise to probable cause to
believe that there is child pornography or sexually explicit
images of children on SUBJECT DEVICES THREE through THIRTY FOUR.

13.   There is also probable cause to believe the SUBJECT
DEVICES contain information about ISAJANYAN's travel to sexually
contact juveniles.  Based on my training and experience, and the
training and experience of other law enforcement officers
experienced in investigating crimes involving the sexual
exploitation of children with whom I have had discussions, I
have learned that individuals who produce and store sexually
graphic images of children have a sexual interest in children
and that there are certain characteristics common to such
individuals:

a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children; or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or in other visual media; or from literature
describing such activity.

b.   Individuals who have a sexual interest in
children or images of children may collect sexually explicit or
suggestive materials, in a variety of media, including
photographs, magazines, motion pictures, videotapes, books,

16   Instrumentality Protocol

slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes for many years.

d.   Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.   Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.   Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.   Child pornography received via computer is extremely mobile.  Through computer technology, digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto thumb drives so small that they fit onto a keychain.  Just as easily, these files can be copied onto floppy disks or compact disks, and/or stored on iPods, Blackberries, or cellular telephones.  Because ISAJANYAN likely collects and values child pornography and sexually explicit images of children, which are easily-stored and duplicated, there is probable cause to believe that evidence of a child pornography collection will be found in the SUBJECT DEVICES.

18   Instrumentality Protocol

## IX.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

14.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The approximate storage volume of the items to be searched is 456.5 gigabytes.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single

gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

      d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can

                              21   Instrumentality Protocol

record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

      f.   Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

      g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains

text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

   h.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## X.   CONCLUSION

15.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found on the SUBJECT DEVICES, as described in Attachment A.


_____
Randall Devine
Special Agent Federal Bureau
of Investigation


Subscribed to and sworn before me
this _____ day of June, 2016.


_____
UNITED STATES MAGISTRATE JUDGE

Exhibit A

## APPREHENSION AUTHORIZATION

For use of this form, see AR 27-10; the proponent agency is OTJAG

TO: *(Name and organization of the person to whom authorization is given)*
Ryan C. BROCKSMITH, DES/PMO, USAG-KA, APO AP 96555-9998

*(An affidavit) (A (sworn) or (unsworn) oral statement)* having been made before me by   Yoshi J. KEMEM
                                                                                          *(Name of Affiant)*

Alutiiq Security and Access Control, DES, USAG-KA, APO AP 96555-9998
                                         *(Organization or Address of Affiant)*

*(which affidavit is attached hereto and made a part of this authorization)*, and as I am satisfied that there is probable cause to believe that the matters mentioned in the affidavit are true and correct, that the offense set forth therein has been committed, and the person to be apprehended committed the offense and is located at the place to be searched, you are hereby ordered to search the place known as

the KRS Public Works shop and any place on  Kwajalein Island which Mr. Albert ISANJAN has been assigned to work

for the person descirbed as   Mr. Albert ISANJANYAN, and pursuant to apprehension, search the person of Mr. Albert

ISANJANYAN for the "Iphone" cellphone and camera described in the attached affidavit of Mr. Yoshi L KENEM,

bringing this order to the attention of the *(person apprehended) (person in possession, if any person be found at the place or on the premises searched)*.  The search will be made in the *(daytime) (nighttime)*, and if the person described above is found there, you shall apprehend him/her.

Dated this _____6_____ day of _____May_____ , __2016__ .

| | |
|---|---|
| TYPED NAME AND GRADE OF AUTHORIZING OFFICIAL<br><br>MICHAEL M. LARSEN, Colonel, US Army | DUTY POSITION OF AUTHORIZING OFFICIAL<br><br>COMMANDER |
| ORGANIZATION OF AUTHORIZING OFFICIAL<br><br>US Army Garrison - Kwajalein | SIGNATURE OF AUTHORIZING OFFICIAL |

**DA FORM 3745-1, SEP 2002**        DA FORM 3745-1-R, MAR 85, IS OBSOLETE.                    APD LC v1.01ES

## SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT
AUTHORITY: Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN).

PRINCIPAL PURPOSE: To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents.

ROUTINE USES: Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions.

DISCLOSURE: Disclosure of your SSN and other information is voluntary.

| 1. LOCATION U.S. Army Garrison, Kwajalein Atoll | 2. DATE (YYYYMMDD) 20160506 | 3. TIME 1100 | 4. FILE NUMBER |
|---|---|---|---|

| 5. LAST NAME, FIRST NAME, MIDDLE NAME KEMEM, Yoshi J. | 6. SSN | 7. GRADE/STATUS CIV |
|---|---|---|

8. ORGANIZATION OR ADDRESS
Kwajalein Security and Access Control W-54433

9. I, Yoshi J. Kemem _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On Wednesday, 04 May 2016, at approximately 2130 hrs., I received a phone calls from a member of the Ebeye community stating that some mothers on Ebeye like to file a complaint about an American male who reside on Kwajalein that going over to Ebeye and spend the night on Ebeye with several young underage Marshallese girls at the Ebeye Hotel and other places. The information was also received that the American male is also using his employee that work for him to get the Marshallese girls to him. The caller also stated that the American Male supervisor was using his employee Barson Calep, T-000075, KRS/Public Works to get the girls. I advised the caller to have the mothers go to the National Police Station on Ebeye and meet with Chief of Police Raney Bolkeim and his Investigators to file a police report. From all the information that were received from the caller, an American male supervisor was later identified as Albert Isajanyan, KRS/Public works. Two names of Marshallese girls juvenile were identified by the caller.

On Thursday, 05 May 2016 at 0900 hrs., I called Chief of Police Raney Bolkeim and advised him about the phone call and requested to meet with him and his investigators. At 1700 hrs., Juvenile #1 15 years old, with her mother present was interviewed at the Ebeye National Police Station by Investigator Alexander Capelle. Juvenile #1 stated that Barson Calep took her to Albert Isajanyan and introduce her to him and that how she meet him. Juvenile #1 stated that she only know him by his first name Albert and didn't know his last name. Juvenile #1 stated that Albert purchase beers on several occasion and she drinks with him at the Ebeye Hotel, Calep's house and other places. Juvenile #1 stated that there a picture of Juvenile #2 with no clothes while she was on a bed and in the bathroom of the hotel on Albert's cellphone. Juvenile #1 stated that Juvenile #2 told her that she had sexual intercourse with Albert on several occasion.

At 1900 hrs., Juvenile #2 and grandmother present was interviewed at the National Police Station by Investigator Alexander Capelle and Juvenile #2 admitted that she had sexual intercourse with Albert at the Ebeye Hotel, Barson Calep's house and another apartment located on the lagoon side next to DIY store on Ebeye. Juvenile #2 also stated that there are several pictures of her taken by Albert on his "Iphone" cellphone and his unknown brand name camera with and without clothes. Juvenile #2 stated that the camera is black in color. Juvenile #1 and #2 both stated that Albert's cellphone number is (692)235-7701.///////////////////////////////////// ////////////////////////////////////////////////END OF STATEMENT//////////////////////////////////////////////////////////////////

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF_____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.*

DA FORM 2823, NOV 2006          PREVIOUS EDITIONS ARE OBSOLETE          APD LC v1 01ES

STATEMENT OF  Yoshi J. Kemem                        TAKEN AT  USAGKA              DATED        20160506

9.  STATEMENT *(Continued)*

<br><br><br><br><br><br><br><br><br><br><br><br><br>

**AFFIDAVIT**

I, Yoshi J. Kemem _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT
WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE ___2___. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE
BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE
CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT
THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to
administer oaths, this _6__ day of __MAY__, _2016_
at _____USAG-KA_____

_____
*(Signature of Person Administering Oath)*

ORGANIZATION OR ADDRESS

BROCKSMITH, RYAN
*(Typed Name of Person Administering Oath)*

TITLE 5 USC SEC 303 (b)
*(Authority To Administer Oaths)*

ORGANIZATION OR ADDRESS

INITIALS OF PERSON MAKING STATEMENT                    PAGE  2  OF  2  PAGES

DA FORM 2823, NOV 2006                                                          APD LC v1 01ES

Exhibit B

**SEARCH AND SEIZURE AUTHORIZATION**
For use of this form, see AR 27-10; the proponent agency is OTJAG

TO: *(Name and Organization of the person to whom authorization is given)*
ROBERT J. STACK DES/PMO USAG-KA APO, AP 96555-9998

*(An affidavit) (a (sworn) or (unsworn) oral statement)* having been made before me by      ROBERT J. STACK

*(Name of Affiant)*

DES/PMO USAG-KA APO, AP 96555-9998

*(Organization or Address of Affiant)*

*(which affidavit is attached hereto and made a part of this authorization)*, and as I am satisfied that there is probable cause to believe that the matters mentioned in the affidavit are true and correct, that the offense set forth therein has been committed, and that the property to be seized is located *(on the person)* *(at the place)* to be searched, you are hereby ordered to search the *(person)* *(place )* known as

SANDS BQ Room 108

for the property described as    the camera described in the attached affidavit of YOSHI J. KEMEM

bringing this order to the attention of the *(person searched)* *(person in possession, if any person be found at the place or on the premises  searched)*. The search will be made in the *(daytime)* *(nighttime)*, and if the property is found there, you shall seize it, issue a receipt therefor to the person from whom the property is taken or in whose possession the property is found, deliver the property to:

Evidence Custodian DES/PMO USAG-KA

*(Name and Organization of Authorized Custodian)*

and prepare a written inventory of the property.  If there is no person at the searched place to whom the receipt may be delivered, the receipt will be left in a conspicuous location at the place or on the premises where the property is found.

Dated this  _____7_____  day of  _____May_____  ,  ___2016___

| TYPED NAME AND GRADE OF AUTHORIZING OFFICIAL<br>MICHAEL M. LARSEN<br>COLONEL, US ARMY | DUTY POSITION OF AUTHORIZING OFFICIAL<br><br>COMMANDER |
|---|---|
| ORGANIZATION OF AUTHORIZING OFFICIAL<br>US Army Garrison, Kwajalein<br>APO AP 96555-9998 | SIGNATURE OF AUTHORIZING OFFICIAL |

DA FORM 3745, SEP 2002          DA FORM 3745-R, MAR 85, IS OBSOLETE          APD I C v1.02ES

## AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND
For use of this form, see AR 27-10; the proponent agency is OTJAG.

*BEFORE COMPLETING THIS FORM, SEE INSTRUCTIONS ON PAGE 2*

| 1. I, | Robert J. STACK | , | DES/PMO, USAG-KA, APO AP 96555 |
|---|---|---|---|
| | *(Name)* | | *(Organization or Address)* |

asd

having been duly sworn, on oath depose and state that:

On 6 May 2016, at about 2210 hours, based on an apprehension authorization from COL Michael M. LARSEN, Mr. Albert ISAJANYAN was apprehended at the Dock Security Checkpoint, US Army Garrison - Kwajalein. Upon apprehension, assisted by Mr. Gregory Bush, Mr. Benjamin Finn conducted a search of his person incident thereto, which revealed an iPhone, black in color, that was locked. Mr. ISAJANYAN declined to unlock the iPhone. It was secured as evidence.

2. The affiant further states that:

Based on the affidavit of Mr. Yoshi J. KEMEM [attached], I am aware that Mr. ISAJANYAN was recently in possession of the camera described in Mr. KEMEM's affidavit, but which was not found in the search of his person. I am also aware that Mr. ISAJANYAN is assigned quarters described as SANDS BQ, Room 108, in which storage of expensive personal items is authorized and likely. I am not aware of any other place in which Mr. ISAJANYAN is authorized to store personal items of value. Given that the items described above are not of a type that would likely be discarded, or stored in a non-secure location, it is likely that the camera is located at Mr. ISAJANYAN's quarters at SANDS BQ, Room 108.

DA FORM 3744, SEP 2002          DA FORM 3744-R, MAR 85. IS OBSOLETE.          APD LC v1 01ES

3. In view of the foregoing, the affiant requests that an authorization be issued for a search of ___the quarters assigned to Mr. ISAJANYAN,___

_(the person) (and)_

SANDS BQ, Room 108, US Army Garrison - Kwajalein, APO AP 96555

_(the quarters or billets) (and)_

_____  and (seizure) (apprehension) of ___the camera described in the attached___
_(the automobile)_        (                              )       _(items/persons searched for)_

affadavit of Yoshi J. KEMEM.

| | |
|---|---|
| TYPED NAME AND ORGANIZATION OF AFFIANT<br>Robert J. STACK, DES/PMO, USAG-KA, APO AP 96555 | SIGNATURE OF AFFIANT<br>_Robert J. Stack_ |

SWORN TO AND SUBSCRIBED BEFORE ME THIS ____6th____ DAY OF _____May_____ ____2016____ AT ___US Army___
Garrison - Kwajalein, APO AP 96555-9998

| | |
|---|---|
| TYPED NAME, ORGANIZATION AND OFFICIAL CAPACITY OF AUTHORITY<br>ADMINISTERING THE OATH<br>Alexander C. LAMB, Director of Emergency Services/Provost Marshal,<br>US Army Garrison - Kwajalein, APO AP 96555-9998 | SIGNATURE OF AUTHORITY ADMINISTERING THE OATH |

## INSTRUCTIONS FOR
_AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND_

1. In paragraph 1, set forth a concise, factual statement of the offense that has been committed or the probable cause to believe that it has been committed. Use additional page if necessary.

2. In paragraph 2, set forth facts establishing probable cause for believing that the person, premises, or place to be searched and the property to be seized or the person(s) to be apprehended are connected with the offense mentioned in paragraph 1, plus facts establishing probable cause to believe that the property to be seized or the person(s) to be apprehended are presently located on the person, premises, or place to be searched. Before a person may conclude that probable cause to search exists, he or she must first have a reasonable belief that the person, property or evidence sought is located in the place or on the person to be searched. The facts stated in paragraphs 1 and 2 must be based on either the personal knowledge of the person signing the affidavit or on hearsay information which he/she has plus the underlying circumstances from which he/she has concluded that the hearsay information is trustworthy. If the information is based on personal knowledge, the affidavit should so indicate. If the information is based on hearsay information, paragraph 2 must set forth some of the underlying circumstances from which the person signing the affidavit has concluded that the informant (whose identity need not be disclosed) or his/her information was trustworthy. Use additional pages if necessary.

3. In paragraph 3, the person, premises, or place to be searched and the property to be seized or the person(s) to be apprehended should be described with particularity and in detail. Authorization for a search may issue with respect to a search for fruits or products of an offense, the instrumentality or means of committing the offense, contraband or other property the possession of which is an offense, the person who committed the offense, and under certain circumstances for evidentiary matters.

Exhibit C

## SEARCH AND SEIZURE AUTHORIZATION
For use of this form, see AR 27-10; the proponent agency is OTJAG

TO: *(Name and Organization of the person to whom authorization is given)*

Ryan C. BROCKSMITH, DES/PMO, USAG-KA, APO AP 96555

*(An affidavit) (A sworn) or (unsworn) oral statement)* having been made before me by   Ryan C. BROCKSMITH

*(Name of Affiant)*

DES/PMO, USAG-KA, APO AP 96555

*(Organization or Address of Affiant)*

*(which affidavit is attached hereto and made a part of this authorization)*, and as I am satisfied that there is probable cause to believe that the matters mentioned in the affidavit are true and correct, that the offense set forth therein has been committed, and that the property to be seized is located *(on the person) (at the place)* to be searched, you are hereby ordered to search the ~~(person)~~ *(place )* known as

SAND BQ, Room 108

for the property described as  the desktop computer depicted in the photograph attached to the affidavit, and digital media on

which digital photographs may be stored

bringing this order to the attention of the *(person searched)* ~~(person in possession)~~, if any person be found at the place or on the premises searched). The search will be made in the *(daytime)* ~~(nighttime)~~, and if the property is found there, you shall seize it, issue a receipt therefor to the person from whom the property is taken or in whose possession the property is found, deliver the property to:

Evidence Custodian, DES/PMO, USAG-KA, APO AP 96555

*(Name and Organization of Authorized Custodian)*

and prepare a written inventory of the property. If there is no person at the searched place to whom the receipt may be delivered, the receipt will be left in a conspicuous location at the place or on the premises where the property is found.

Dated this   7   day of   May  ,   2016 .

| TYPED NAME AND GRADE OF AUTHORIZING OFFICIAL | DUTY POSITION OF AUTHORIZING OFFICIAL |
|---|---|
| MICHAEL M. LARSEN, Colonel, US Army | Commander |
| ORGANIZATION OF AUTHORIZING OFFICIAL | SIGNATURE OF AUTHORIZING OFFICIAL |
| US Army Garrison-Kwajalein, APO AP 96555-9998 | |

**DA FORM 3745, SEP 2002**    DA FORM 3745-R, MAR 85, IS OBSOLETE    APD LC v1.02ES

3.  In view of the foregoing, the affiant requests that an authorization be issued for a search of ___the quarters assigned to Mr. ISAJANYAN,___

*(the person) (and)*

___SANDS BQ, Room 108, US Army Garrison - Kwajalein, APO AP 96555___

*(the quarters or billets) (and)*

_____ and (seizure) (apprehension) of ___the desktop computer, two laptop computers,___

*(the automobile)*          (                              )          *(items/persons searched for)*

___and any digital media on which digital photographs may be stored.___

| TYPED NAME AND ORGANIZATION OF AFFIANT | SIGNATURE OF AFFIANT |
|---|---|
| Ryan C. BROCKSMITH, DES/PMO, USAG-KA, APO AP 96555 | |

SWORN TO AND SUBSCRIBED BEFORE ME THIS ___7th___ DAY OF ___May___ ___2016___ AT ___US Army___
Garrison - Kwajalein, APO AP 96555-9998

| TYPED NAME, ORGANIZATION AND OFFICIAL CAPACITY OF AUTHORITY ADMINISTERING THE OATH | SIGNATURE OF AUTHORITY ADMINISTERING THE OATH |
|---|---|
| Alexander C. LAMB, Director of Emergency Services/Provost Marshal, US Army Garrison - Kwajalein, APO AP 96555-9998 | |

## INSTRUCTIONS FOR
*AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND*

1.  In paragraph 1, set forth a concise, factual statement of the offense that has been committed or the probable cause to believe that it has been committed. Use additional page if necessary.

2.  In paragraph 2, set forth facts establishing probable cause for believing that the person, premises, or place to be searched and the property to be seized or the person(s) to be apprehended are connected with the offense mentioned in paragraph 1, plus facts establishing probable cause to believe that the property to be seized or the person(s) to be apprehended are presently located on the person, premises, or place to be searched. Before a person may conclude that probable cause to search exists, he or she must first have a reasonable belief that the person, property or evidence sought is located in the place or on the person to be searched. The facts stated in paragraphs 1 and 2 must be based on either the personal knowledge of the person signing the affidavit or on hearsay information which he/she has plus the underlying circumstances from which he/she has concluded that the hearsay information is trustworthy. If the information is based on personal knowledge, the affidavit should so indicate. If the information is based on hearsay information, paragraph 2 must set forth some of the underlying circumstances from which the person signing the affidavit has concluded that the informant (whose identity need not be disclosed) or his/her information was trustworthy. Use additional pages if necessary.

3.  In paragraph 3, the person, premises, or place to be searched and the property to be seized or the person(s) to be apprehended should be described with particularity and in detail. Authorization for a search may issue with respect to a search for fruits or products of an offense, the instrumentality or means of committing the offense, contraband or other property the possession of which is an offense, the person who committed the offense, and under certain circumstances for evidentiary matters.